**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| FINE AGROCHEMICALS LTD., | ) | |
| FINE AMERICAS INC.; | ) | |
| CJB INDUSTRIES, INC.; and | ) | |
| VIVID LIFE SCIENCES, LLC, | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **DEMAND FOR A JURY TRIAL** |
| STOLLER ENTERPRISES, INC.; | ) | |
| THE STOLLER GROUP, INC.; and | ) | |
| STOLLER USA, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Fine Agrochemicals Ltd. and Fine Americas Inc. (collectively, "Fine"), CJB

Industries, Inc., ("CJB"), and Vivid Life Sciences, LLC, ("Vivid") (collectively, "Plaintiffs") for

their complaint against Defendants Stoller Enterprises, Inc.; The Stoller Group, Inc.; and Stoller

USA, Inc. (collectively, "Stoller" or "Defendants"), allege as follows:

### NATURE OF THE ACTION

1.      Fine, Fine's contract manufacturer CJB, and Fine's customer Vivid bring this action

seeking a declaratory judgment that: (a) Plaintiff's Plant Growth Regulator Products, including

VIGEO® (EPA Reg. No. 62097-45-92697), (the "Relevant Products") do not infringe any claim of

United States Patent 10,104,883 ("the '883 Patent," attached hereto as Exhibit A); (b) Plaintiffs do

not and have not infringed, induced others to infringe, or contributed to the infringement by others

of any claim of the '883 Patent; and (c) the '883 Patent is unenforceable in view of inequitable

conduct committed during its prosecution.

2.      Plaintiffs seek to enjoin Stoller and its officers, employees, or representatives from

continuing to engage in deceptive trade practices such as: (1) alleging that Plaintiffs or their customers infringe one or more claims of the '883 Patent; (2) taking any action to suggest that the Plaintiffs or their customers require a license from Stoller for the '883 Patent; or (3) pursuing or continuing to pursue infringement actions against Plaintiffs or their customers on the basis of the manufacture, use, importation, sale, or offer for sale of the Relevant Products.

3.     Plaintiffs seek this necessary relief because Stoller, which claims to be the owner of the '883 Patent, has contacted CJB and Vivid in writing, and in that writing, alleged infringement of one or more claims of the '883 Patent, demanded destruction of the Relevant Products, and threatened legal remedies. (*See* Exs. B and C).

4.     In its communications with CJB and Vivid, Stoller referenced the Relevant Products, and thereby established at least a reasonable apprehension and reasonable potential that Stoller would file a lawsuit against the Plaintiffs or their customers alleging infringement of one or more claims of the '883 Patent.

5.     Stoller's actions have thus (i) cast uncertainty over the Plaintiffs' businesses, products, and customers, (ii) injured and are injuring Plaintiffs' businesses and business relationships with the other Plaintiffs, and (iii) created a concrete and immediate justiciable controversy between the Plaintiffs and Stoller.  Accordingly, Plaintiffs bring this case to clear their names and to protect them against Stoller's meritless claims.

## **PARTIES**

6.     Plaintiff Fine Agrochemicals Ltd. is a UK corporation with a principal place of business at Hill End House, Whittington, Worcester WR5 2RQ, United Kingdom.

7.     Plaintiff Fine Americas Inc. is a Delaware Corporation with a principal place of business in the U.S. at 1850 Mt. Diablo Blvd # 405, Walnut Creek, CA 94596.

8.      Plaintiff CJB Industries, Inc. is a Georgia corporation with a principal place of business at 204 E. Hill Ave., Valdosta, GA 31601.

9.      Vivid Life Sciences, LLC is a Florida limited liability corporation with a principal place of business at 31932 136th Street, Princeton, MN 55371.

10.     Stoller Enterprises, Inc. is a Texas corporation with a principal place of business at 9090 Katy Freeway, Suite 400, Houston, TX 77024.

11.     The Stoller Group, Inc. is a Texas corporation with a principal place of business at 9090 Katy Freeway, Suite 400, Houston, TX 77024.

12.     Stoller USA, Inc. is a Texas corporation with a principal place of business at 9090 Katy Freeway, Suite 400, Houston, TX 77024.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 2201, 1331, and 1338(a) because this action arises under the patent laws, and seeks relief under the Federal Declaratory Judgment Act. 28 U.S.C. § 2201.

14.     Stoller is subject to personal jurisdiction in the Middle District of Georgia.

15.     For over two decades, Stoller has purposefully directed sales, marketing, support, and other activities to residents of this District.

16.     Stoller has purposefully directed sales, marketing, and support of products that compete in this District with Fine's products and/or Vivid's products.

17.     Stoller has purposefully directed sales, marketing, and support of products that compete in this District with the Relevant Products.

18.     Stoller has purposefully directed sales, marketing, and support of products in this District that are allegedly relevant to one or more claims of the '883 Patent.

19.     Stoller recently sent a letter to CJB, a resident of the District, demanding it cease the production of and sale of products manufactured in the District and allegedly covered by one or more claims of the '883 Patent and that it destroy such products. (Ex. B).

20.     As early as 1994, Stoller's agent in the District corresponded with the U.S. Environmental Protection Agency regarding the labeling of one of Stoller's products that is relevant to one or more claims of the '883 Patent. (Ex. I, at 1).

| | |
|---|---|
| Linda C. Watson<br>Agent for:  STOLLER ENTERPRISES, INC.<br>3703 Sedgefield Drive<br>Valdosta, GA  31602 | OFFICE OF<br>PREVENTION, PESTICIDES AND<br>TOXIC SUBSTANCES |
| Subject:      Label Amendment Submission of 09/15/93 in Response to PR Notice 93-7<br>EPA Reg. No. 57538-13<br>STIMULATE YEILD ENHANCER | |

21.     Stoller markets directly to growers in the District.

22.     Residents of this District have purchased Stoller products in this District.

23.     Residents of this District have used Stoller products in this District.

24.     Stoller attended the 2017 Sunbelt Agricultural Exposition Field Day, which was held in this District in Moultrie, Georgia. (Ex. F, at 5 & 13).

25.     Stoller has posted numerous videos on YouTube that include testimonials of farmers in this District, including in Lenox, GA and Adele, GA, regarding their use of Stoller's products. A listing of web-links to these videos is shown in Exhibit G.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## BACKGROUND

27.     Fine Agrochemicals Ltd. was established in 1983 and is a worldwide leader in the development, manufacture, and marketing of plant growth regulators (PGRs) for the agricultural,

greenhouse, ornamental, and landscape markets and is a recognized center of excellence for PGR technology.

28.     Fine Americas Inc. was established in 2004 and is a leading supplier of PGRs for the agricultural, green house ornamental, and landscape industries.

29.     CJB is a custom chemical manufacturer and manufactures PGR formulations, including a Fine formulation marketed by Vivid under the VIGEO brand.

30.     Vivid is a distributor of Fine's Products, including the VIGEO product manufactured by CJB.

31.     Stoller purports to own the '883 Patent, entitled "Non-aqueous solution of plant-growth regulator(s) and polar and/or semi-polar organic solvent(s)." The '883 Patent issued on October 23, 2018.

32.     Stoller sent letters to CJB and Vivid, alleging that they are infringing one or more claims of the '883 Patent (collectively, the "Threat Letters," which are attached respectively as Exhibits B and C).

33.     In the Threat Letters, Stoller (i) alleges that making, using, selling, and/or offering for sale the VIGEO product infringes one or more claims of the '883 Patent, and (ii) demands that CJB and Vivid cease the making, using, selling, and/or offering for sale the VIGEO product, and destroy any VIGEO product in their or their customers' possession and control.

34.     The Threat Letters allege that CJB is manufacturing VIGEO for Vivid.

35.     The Threat Letters state that should CJB or Vivid fail to respond within 10 days, Stoller will seek further legal remedies.

36.     The Plaintiffs thus have a reasonable apprehension, and there exists a reasonable potential, that Stoller could file an action against the Plaintiffs and allege that they have directly

infringed one or more claims of the '883 Patent by making, using, selling, and/or offering for sale the Relevant Products.

37.     The Plaintiffs also have a reasonable apprehension, and there exists a reasonable potential, that Stoller could file an action against the Plaintiffs and allege that they have actively induced end-users to infringe one or more claims of the '883 Patent by, among other things, making available to end-users the Relevant Products.

38.     The Plaintiffs also have a reasonable apprehension, and there exists a reasonable potential, that Stoller could file an action against Plaintiffs and allege that the Plaintiffs have contributed to the infringement of one or more claims of the '883 Patent by, among other things, making available to end-users the Relevant Products.

39.     However: (i) Plaintiffs have not infringed any claim of the '883 Patent, (ii) the Relevant Products do not infringe any claim of the '883 Patent, (iii) Plaintiffs have not induced others to infringe any claim of the '883 Patent, and (iv) Plaintiffs have not contributed to the infringement by others of any claim of the '883 Patent. In addition, the '883 Patent is unenforceable due to inequitable conduct during its prosecution, absent which it would not have issued.

40.     Stoller's meritless claims and allegations have (i) cast uncertainty over the Plaintiffs' businesses and the Relevant Products, (ii) injured and are injuring Plaintiffs' businesses and business relationships, and (iii) created a concrete and immediate justiciable controversy between the Plaintiffs and Stoller.

41.     Plaintiffs bring this case to clear their names and to protect their customers against Stoller's meritless claims of infringement, and to have the '883 Patent declared unenforceable.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment of Non-infringement of the '883 Patent)

42.     Plaintiffs repeat, reallege, and incorporate the prior allegations of the Complaint as if fully set forth herein.

43.     Plaintiffs have not infringed, induced others to infringe, or contributed to the infringement by others of any of the independent claims of the '883 Patent, or any of the claims that depend thereupon.

44.     The Relevant Products at least, by way of example, do not literally or under the doctrine of equivalents meet the limitation of the claims of the '883 Patent that requires: "wherein said non-aqueous solution is stable and said at least one organic solvent and said less than 5 wt. % water are the only solvents present in said non-aqueous solution." (Ex. A, at col. 12, ll. 64-67; col. 13, ll. 17-20; col. 14, ll. 46-49).

45.     The claim limitation recited by the preceding paragraph is required by every independent claim of the '883 Patent, i.e., claims 1, 2, and 18.

46.     Because the Relevant Products do not meet, literally or under the doctrine of equivalents, at least one limitation of the independent claims of the '883 Patent, the manufacture, use, sale, offer for sale, or importation of the Relevant Products does not infringe any claim of the '883 Patent.

47.     Plaintiffs seek and are entitled to a declaratory judgment that the manufacture, use, sale, offer for sale, or importation of the Relevant Products does not infringe under 35 U.S.C. § 271 (or any sub-section thereof) any claim of the '883 Patent, literally or under the doctrine of equivalents.

48.     Plaintiffs seek and are entitled to a declaratory judgment that neither they nor their

customers infringe any claim of the '883 Patent, literally or under the doctrine of equivalents.

49.     Plaintiffs seek and are entitled to a declaratory judgment that neither they nor their customers have induced others to infringe or contributed to the infringement by others of any claim of the '883 Patent, literally or under the doctrine of equivalents.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment of Unenforceability of the '883 Patent)

50.     Plaintiffs repeat, reallege, and incorporate the prior allegations of the Complaint as if fully set forth herein.

51.     The '883 Patent is unenforceable due to inequitable conduct committed during its prosecution.

### Ground 1 – Stoller's Deceptive Deletion of Sample Age Information In Its Non-Provisional Patent Application

52.     The '883 Patent is directed to improving the stability of liquid PGR formulations during storage compared with the existing art, specifically aqueous (or water-containing) formulations.

53.     The '883 Patent indicates, for example, that "the efficient use of aqueous systems with certain agrochemicals and crop protection agents is restricted due to their poor chemical stability . . . ." (Ex. A, col. 2, ll. 61-64).

54.     The '883 Patent claims priority to U.S. Provisional Application No. 62/103,410 (the "Provisional Application"), which was filed on January 14, 2015. (Attached hereto as Exhibit E). Jennifer Yancy of Yancy IP Law in Alexandria, Virginia filed the Provisional Application on behalf of Ritesh Sheth and Jerry Stoller. (Ex. E, at 2).

55.     Mr. Stoller is the founder and owner of each of Stoller Enterprises, Inc.; The Stoller Group, Inc.; and Stoller USA, Inc.

56.    Ms. Yancy also filed non-provisional U.S. Patent Application No. 14/995,434 (the "Non-Provisional Application"), which claims priority to the Provisional Application. The Non-Provisional Application ultimately issued as the '883 Patent. (Attached hereto in the Prosecution History as Exhibit D).

57.    Ms. Yancy continued to represent Stoller before the U.S. Patent and Trademark Office throughout prosecution of the application that led to '883 Patent.

58.    Ms. Yancy continues to represent Stoller, as evidenced by her having sent the Threat Letters to CJB and Vivid.

59.    To support Stoller's claim of improved storage stability by the invention, the Provisional Application contained stability data from accelerated storage stability tests, where the long term storage of samples was simulated over a shortened period of time.

60.    This stability data included both data from samples that were said to embody the alleged invention as well as data from aqueous comparative samples (referred to as "Competitors"). *See, e.g.*, Table 2 of the Provisional Application (Ex. E, at 20):

| Table 2: Kinetin Stability data (FIG. 1) | | | |
|---|---|---|---|
| | 0 days | 7 days | 14 days |
| Plant Growth Regulators 10 X (Organic) | 100.0% | 98.0% | 96.9% |
| Plant Growth Regulators 1 X (Organic) | 100.0% | 109.1% | 100.0% |
| Plant Growth Regulators (Organic) | 100.0% | 102.9% | 100.7% |
| Competitors (Aqueous 3 yrs old) | 14.2% | 17.2% | 16.2% |
| Plant Growth Regulators 1X(Aqueous) | 100.0% | 83.2% | 68.9% |

61.    The stability data referenced in the preceding paragraph was included in the Provisional Application to demonstrate that the inventive samples had improved stability over the

comparative samples.

62.     The comparative samples referenced in the two preceding paragraphs were referred to as a "Competitors" sample in the Provisional Application.

63.     The Provisional Application indicated at least seven (7) times that the "Competitors" sample used in the comparison testing was a "3 yrs old" sample. (Ex. E, at 20–21 & FIGS. 1–3).

64.     When Stoller later converted the Provisional Application to the Non-Provisional Application, however, all references to the advanced age of the comparative samples were intentionally removed.

*Compare* Provisional Application, Ex. E, at 20:

> The product #s provided in Table 1 correspond to the following labels in the Figures:
>
> #1 – Plant Growth Regulators 10X        #2 – Plant Growth Regulators 1X
>
> #3 – Plant Growth Regulator        #4 – Competitors (3 yr. old)

*with* Non-Provisional Application, Ex. D, at 29:

> [0047] The product's provided in Table 1 correspond to the following labels indicated below:
>
> #1 – Plant Growth Regulators 10X        #2 – Plant Growth Regulators 1X
>
> #3 – Plant Growth Regulator        #4 – Competitors (Aqueous)
>
> #5 – Plant Growth Regulator 1X (Aqueous)

65.     There are no references to the age of the "Competitors" sample in the Non-Provisional Application. (Ex. D).

66.     There are no references to the age of the "Competitors" sample in the '883 Patent. Ex. A, at 6:

The product's provided in Table 1 correspond to the following labels indicated below:
#1 - Plant Growth Regulators 10X
#2 - Plant Growth Regulators 1X
#3 - Plant Growth Regulator
#4 - Competitors (Aqueous)
#5 - Plant Growth Regulator 1X (Aqueous)

67.     Mr. Stoller, Mr. Sheth, and/or Ms. Yancy intentionally removed information relating to the age of the "Competitors" sample from the Non-Provisional Application to mislead the Patent Office Examiner into believing that the examples were an apples-to-apples comparison of similarly aged samples.

68.     A three year old sample of the type described in Product #4 of Table 1 of the Provisional Application would be expected to have a significantly lower efficacy than a newly manufactured or "fresh" sample of the same type. (Ex. E, at 20).

69.     The advanced age of the "Competitors" sample discussed in the preceding paragraphs would be material to a Patent Examiner at least because it is directly relevant to whether the "Competitors" sample could be reasonably compared to a "fresh" sample manufactured according to the claimed invention.

70.     The intentional deletion of this information upon filing the Non-Provisional Application is especially pertinent in view of Applicant's admission that conventional aqueous samples have "poor chemical stability." (Ex. D, at 15, 24–25).

71.     The removal of all references to the advanced age of the "Competitors" sample is critical to and inconsistent with Stoller's argument to the USPTO that the claims of the '883 Patent were novel and non-obvious and constitutes "but for" materiality and/or egregious misconduct during prosecution of the '883 Patent.

72.     The single most reasonable inference that can be drawn from the deleted information

concerning the age of the "Competitors" sample upon filing the Non-Provisional Application is that Mr. Stoller, Mr. Sheth, and/or Ms. Yancy possessed specific intent to deceive the USPTO.

### Ground 2 – Deceptive Modification of "Competitors" Stability Data In Non-Provisional Patent Application

73.     In addition to removing all reference to the age of the "Competitors" sample, upon converting the Provisional Application to the Non-Provisional Application, Mr. Stoller, Mr. Sheth, and/or Ms. Yancy improperly and intentionally *altered* the stability data in the specification to make the data look more favorable for Stoller.

74.     The Examples described in the '883 Patent purportedly tested the storage stability of PGRs in the described formulation in accelerated testing over 0, 7, and 14 days.

75.     The data in Table 2 of the Provisional Application indicates that the Kinetin Stability of the Competitors sample started at 14.2% stability at day 0, and then actually increased in stability to 17.2% and 16.2% stability at day 7 and day 14, respectively. (Ex. E, at 20).

| Table 2: Kinetin Stability data (FIG. 1) | | | |
|---|---|---|---|
| | 0 days | 7 days | 14 days |
| Plant Growth Regulators 10 X (Organic) | 100.0% | 98.0% | 96.9% |
| Plant Growth Regulators 1 X (Organic) | 100.0% | 109.1% | 100.0% |
| Plant Growth Regulators (Organic) | 100.0% | 102.9% | 100.7% |
| Competitors (Aqueous 3 yrs old) | 14.2% | 17.2% | 16.2% |
| Plant Growth Regulators 1X(Aqueous) | 100.0% | 83.2% | 68.9% |

76.     The increasing stability shown for the "Competitors" data in Table 2 of the Provisional Application was unfavorable to Stoller's patentability arguments. (Ex. E, at 20).

77.     As shown below, the data above was intentionally modified upon filing of the Non-Provisional Application (which ultimately issued as the '883 Patent) to increase the day 0 value

from 14.2% to 100.0%.

*Compare* Provisional Application, Ex. E, at 20:

| Table 2: Kinetin Stability data (FIG. 1) | | | |
|---|---|---|---|
| | 0 days | 7 days | 14 days |
| Plant Growth Regulators 10 X (Organic) | 100.0% | 98.0% | 96.9% |
| Plant Growth Regulators 1 X (Organic) | 100.0% | 109.1% | 100.0% |
| Plant Growth Regulators (Organic) | 100.0% | 102.9% | 100.7% |
| Competitors (Aqueous 3 yrs old) | 14.2% | 17.2% | 16.2% |
| Plant Growth Regulators 1X(Aqueous) | 100.0% | 83.2% | 68.9% |

*with* Non-Provisional Application, Ex. D, at 29–30:

| Table 2: Kinetin Stability data | | | |
|---|---|---|---|
| | 0 days | 7 days | 14 days |
| #1 | 100.0% | 98.0% | 96.9% |
| #2 | 100.0% | 109.1% | 100.0% |
| #3 | 100.0% | 102.9% | 100.7% |
| #4 | 100.0% | 17.2% | 16.2% |
| #5 | 100.0% | 83.2% | 68.9% |

[0047] The product's provided in Table 1 correspond to the following labels indicated below:

#1 – Plant Growth Regulators 10X     #2 – Plant Growth Regulators 1X

#3 – Plant Growth Regulator     #4 – Competitors (Aqueous)

#5 – Plant Growth Regulator 1X (Aqueous)

78.     Modifying the data as explained in the preceding paragraphs misrepresented that the stability of the "Competitors" sample decreased significantly from 100% to 17.2% and to 16.2% over the course of the storage testing, when the stability of the "Competitors" sample actually *increased* during testing from 14.2% to 17.2% and to 16.2%.

79.     Mr. Stoller, Mr. Sheth, and/or Ms. Yancy intentionally changed the starting Kinetin value from 14.2% to 100% to hide from the Examiner the fact that the "Competitors" sample was not a full strength sample on day 0.

80.     Further, the data in Table 4 of the Provisional Application indicates that the Gibberellin (GA3) stability of the "Competitors" sample started at 0.3% stability at day 0, and then actually increased in stability to 1.3% and 1.3% stability at day 7 and day 14, respectively. (Ex. E, at 21).

| Table 4:  GA3 Stability data (FIG. 3) | | | |
|---|---|---|---|
| | 0 | 7 | 14 |
| Plant Growth Regulators 10 X | 100.0% | 92.3% | 88.7% |
| Plant Growth Regulators 1 X | 100.0% | 95.9% | 95.9% |
| Competitors (Aqueous 3 yrs old) | 0.3% | 1.3% | 1.3% |
| Plant Growth Regulators 1X(Aqueous) | 100.0% | 0.0% | 0.0% |

81.     This data, which was unfavorable to Stoller's patentability arguments, also was intentionally modified upon filing of the Non-Provisional Application (which ultimately issued as the '883 Patent) to increase the day 0 value from 0.3% to 100.0%. (Ex. D, at 30).

*Compare* Provisional Application, Ex. E, at 21:

| Table 4:  GA3 Stability data (FIG. 3) | | | |
|---|---|---|---|
| | 0 | 7 | 14 |
| Plant Growth Regulators 10 X | 100.0% | 92.3% | 88.7% |
| Plant Growth Regulators 1 X | 100.0% | 95.9% | 95.9% |
| Competitors (Aqueous 3 yrs old) | 0.3% | 1.3% | 1.3% |
| Plant Growth Regulators 1X(Aqueous) | 100.0% | 0.0% | 0.0% |

*with* Non-Provisional Application, Ex. D, at 30:

| Table 4:  GA3 Stability data | | | |
|---|---|---|---|
| | 0 days | 7 days | 14 days |
| #1 | 100.0% | 92.3% | 88.7% |
| #2 | 100.0% | 95.9% | 95.9% |
| #4 | 100.0% | 1.3% | 1.3% |
| #5 | 100.0% | 0.0% | 0.0% |

[0047] The product's provided in Table 1 correspond to the following labels indicated below:

#1 – Plant Growth Regulators 10X          #2 – Plant Growth Regulators 1X

#3 – Plant Growth Regulator                    #4 – Competitors (Aqueous)

#5 – Plant Growth Regulator 1X (Aqueous)

82.     This modification misrepresented that the stability of the "Competitors" sample decreased significantly from 100% to 1.3% over the course of the storage testing, when the stability of the Competitor sample actually *increased* during testing from 0.3% to 1.3%.

83.     Mr. Stoller, Mr. Sheth, and/or Ms. Yancy intentionally changed the starting

Gibberellin (GA3) value from 0.3% to 100% to hide from the Examiner the fact that the Competitor sample was not a full strength sample on day 0. (Ex. E, at 21; Ex. D, at 30).

84.    Stoller relied on this misrepresented data during prosecution of the Non-Provisional Application.

85.    Stoller submitted a declaration by inventor Sheth (the "Sheth Declaration") during prosecution of the Non-Provisional Application. (*See* Ex. D, at 115–16).

86.    The Sheth declaration relies on the alleged increased stability of Stoller's samples over the intentionally altered "Competitors" sample in arguing for the patentability of the claims.

87.    Submission of the Sheth Declaration to the U.S. Patent & Trademark Office demonstrates that Mr. Stoller, Mr. Sheth, and/or Ms. Yancy fraudulently relied on the misrepresented and altered stability data in support of their patentability arguments.

88.    Stoller alleged that its invention provided improved stability over the prior art, and thus its comparison with the stability of the prior art was at the heart of its patent application.

89.    The '883 Patent even touts that "[t]he non-aqueous solution containing plant growth regulators has enhanced stability compared to [the] aqueous composition." (*See* Ex. A, col. 4, ll. 41-46; *see also* Ex. A, col. 12, ll. 29-33).

90.    This assertion that "[t]he non-aqueous solution containing plant growth regulators has enhanced stability compared to [the] aqueous composition" is foundational to Stoller's alleged invention.

91.    The assertion that "[t]he non-aqueous solution containing plant growth regulators has enhanced stability compared to [the] aqueous composition" is inconsistent with the actual unaltered data in Example 4 ("Competitors (Aqueous 3 yrs old)") as originally filed in the Provisional Application. (Ex. E, at 21).

92.     But for the modified data discussed in the preceding paragraphs, one or more claims in the '883 Patent would never have issued.

93.     The modification of the data upon filing the Non-Provisional Application constitutes egregious misconduct during prosecution of the '883 Patent.

94.     Mr. Stoller, Mr. Sheth, and/or Ms. Yancy intended to deceive the USPTO by making the changes discussed in the preceding paragraphs.

95.     The data in the samples was intentionally altered upon filing the Non-Provisional Application in an attempt to hide the fact that the "Competitors" sample was a three-year old sample and lacked efficacy even on day 0.

96.     The data in the samples was intentionally altered by Mr. Stoller, Mr. Sheth, and/or Ms. Yancy upon filing the Non-Provisional Application in an attempt to make the prior art appear less stable than purported inventive samples.

97.     Mr. Stoller, Mr. Sheth, and/or Ms. Yancy relied on falsified data in order to obtain allowance of the patent.

98.     The single most reasonable inference that can be drawn from the altered data is that Mr. Stoller, Mr. Sheth, and/or Ms. Yancy possessed specific intent to deceive the USPTO.

99.     The egregious misconduct alleged above satisfies the materiality requirement for inequitable conduct.

100.     Because of the inequitable conduct committed by one or more of Mr. Stoller, Mr. Sheth, and/or Ms. Yancy, Plaintiffs seek and are entitled to a declaratory judgment that the '883 Patent is unenforceable.

### Ground 3 – Failure to Disclose Prior Printed Publications, Public Uses, and Offers for Sale of the Stoller Product

101.     For over twenty years prior to the issuance of the '883 Patent, Stoller marketed, sold

to the public, allowed the public to use, publicly used itself, and/or published information regarding, a plant growth regulator product that included the *exact* same Active Ingredients as those claimed in the '883 Patent (the "Stoller Product"). (*See, e.g.*, Ex. I, at 3).

102.    The Stoller Product included at least one auxin, at least one gibberellin, and at least one cytokinin (collectively, the "Active Ingredients") in concentrations within the ranges claimed in the '883 Patent. (*Compare* Ex. A, Claim 1, *with* Ex. I, at 3).

103.    Mr. Stoller, Mr. Sheth, and Ms. Yancy had a duty during prosecution of the application that led to the '883 Patent to disclose to the patent Examiner all known information material to patentability. 37 C.F.R. § 1.56.

104.    Mr. Stoller, Mr. Sheth, and Ms. Yancy had a duty during prosecution of the '883 Patent to disclose information about the Stoller Product to the U.S. Patent and Trademark Office ("USPTO") during prosecution of the application that led to the '883 Patent.

105.    Neither Mr. Stoller, Mr. Sheth, nor Ms. Yancy ever disclosed any information about the Stoller Product to the USPTO during prosecution of the application that led to the '883 Patent.

106.    Stoller includes references to the Stoller Product (referred to as "Stoller's Stimulate Yield Enhancer") in at least one other patent application, which was published as U.S. Patent Publication US20190008155A1 (the "'155 Publication"), a publication of a patent application filed on July 5, 2018. *See* Fig. 3 of the '155 Publication, Ex. H:



FIG. 3

107.    Both Jerry Stoller and Ritesh Bharat Sheth are listed as inventors on '155 Publication. Ms. Yancy filed and is currently prosecuting this patent application in the USPTO. (Ex. H, at 1).

108.    Thus, those involved in the prosecution of the '883 Patent, including at least Mr. Stoller, Mr. Sheth, and Ms. Yancy, were well-aware of the Stoller Product during prosecution of the application that led to the '883 Patent.

109.    Claim 1 of the '883 Patent recites "A non-aqueous solution comprising: a) a plant growth regulator mixture including 0.001 to 1 wt.% at least one auxin, 0.001-0.3 wt.% at least one gibberellin, and 0.001-0.3 wt.% at least one cytokinin…" along with an organic solvent. (Ex. A, col. 12, ll. 49–52).

110.    At least by the mid-1990's, Stoller was marketing, selling, publishing materials related to, publicly using itself, and/or allowing the public to use the Stoller Product, which was branded "Stimulate Yield Enhancer." *See* EPA Letter, Ex. I, at 1:

| Subject: | Label Amendment Submission of 09/15/93 in Response to PR Notice 93-7 EPA Reg. No. 57538-13 STIMULATE YEILD ENHANCER |
|----------|---|

111.    In March 1994, Linda Watson, an agent for Stoller Enterprises, Inc. who was located in Valdosta, Georgia, submitted to the EPA an amended label for Stimulate Yield Enhancer. (Ex. I, at 1).

112.    The amended label described in the preceding paragraph indicates that Stimulate Yield Enhancer included the three Active Ingredients at the following concentrations: Cytokinin (0.009%), Gibberellic Acid (0.005%) (which is a gibberellin), and Indole-3-butyric acid (0.005%) (which is an auxin). (Ex. I, at 3).

```
                        STIMULATE

                     Yield Enhancer


_____

Active Ingredients:
    Cytokinin (as kinetin)............................... 0.009%
    Gibberellic acid...................................... 0.005%
    Indole-3-butyric acid................................. 0.005%
Inert Ingredients:......................................99.981%

Total:.................................................100.000%

_____
```

113.    The proposed amended label described in the preceding paragraphs was publicly available before January 14, 2014. (Ex. I, at 1-3).

114.    The proposed amended label described in the preceding paragraphs discloses a formulation having the *exact* same Active Ingredient concentration as those provided in allegedly inventive Example #2 of the '883 Patent. (Ex. A, at 6).

*Compare* Table 1, Example 2, of the '883 Patent, Ex. A, at 6:

| | | Kinetin | | | IBA | | | GA$_3$ | |
|---|---|---|---|---|---|---|---|---|---|
| | Label | EPA Label (max) | EPA Label (min) | Label | EPA Label (max) | EPA Label (min) | Label | EPA Label (max) | EPA Label (min) |
| #1 | 0.090% | 0.099% | 0.081% | 0.050% | 0.0550% | 0.0450% | 0.050% | 0.0550% | 0.0450% |
| #2 | 0.009% | 0.010% | 0.008% | 0.005% | 0.0055% | 0.0045% | 0.005% | 0.0055% | 0.0045% |
| #3 | 0.15% | 0.165% | 0.135% | 0.85% | 0.9350% | 0.7650% | | | |
| #4 (Aq) | 0.09% | | | 0.045% | | | 0.03% | | |
| #5 (Aq) | 0.09% | | | 0.050% | | | 0.05% | | |

The product's provided in Table 1 correspond to the following labels indicated below:

#1 - Plant Growth Regulators 10X

#2 - Plant Growth Regulators 1X

#3 - Plant Growth Regulator

#4 - Competitors (Aqueous)

#5 - Plant Growth Regulator 1X (Aqueous)

*with* the 1993 EPA label for Stimulate Yield Enhancer, Ex. I, at 3:

**STIMULATE**

**Yield Enhancer**

**Active Ingredients:**

Cytokinin (as kinetin)............................... 0.009%

Gibberellic acid.................................... 0.005%

Indole-3-butyric acid.............................. 0.005%

Inert Ingredients:................................99.981%

Total:.........................................100.000%

115.    According to both the EPA's and Stoller's websites, Stoller continues to market Stimulate Yield Enhancer or a variant thereof. (*See* Ex. J; Ex. K).

116.    The EPA disclosure of the amended label (Ex. I) constitutes a printed publication having a date before January 14, 2014.

117.    Stoller offered for sale the Stoller Product before January 14, 2014.

118.    The Stoller Product was publicly used before January 14, 2014.

119.    Mr. Stoller, Mr. Sheth, and Ms. Yancy never disclosed any information about the Stimulate Yield Enhancer product to the USPTO during prosecution of the application that led to the '883 Patent.

120.    The single most reasonable inference that can be drawn from the failure of Mr. Stoller, Mr. Sheth, and/or Ms. Yancy to disclose the Stoller Product to the USPTO during prosecution of the application that led to the '883 Patent is that Mr. Stoller, Mr. Sheth, and/or Ms. Yancy possessed specific intent to deceive the USPTO.

121.    Mr. Stoller, Mr. Sheth, and/or Ms. Yancy intentionally deceived the USPTO by not disclosing the Stoller Product to the USPTO during prosecution of the application that led to the '883 Patent.

122.    The amended label described in the preceding paragraphs indicates that the Stoller Product branded under the Stimulate Yield Enhancer trade name contained 99.981% "inert ingredients." (Ex. I, at 3).

123.    A person of ordinary skill in the art as of January 14, 2015 (hereinafter, a "POSA") would understand the "inert ingredients" in the amended label referenced above include primarily a liquid solvent.

124.    A POSA would have known that there were only two choices of liquid solvents for the "inert ingredients" described in the amended label: an aqueous solvent or a non-aqueous solvent.

125.    A POSA would have appreciated that there were a finite number of identified, predictable solutions of possible solvents that could be used for the "inert ingredients" referenced in the above-referenced amended label.

126.    But for the non-disclosure of the Stoller Product to the USPTO during prosecution, one or more claims in the '883 Patent would not have issued.

127.    The failure to disclose the Stoller Product to the USPTO during prosecution constitutes "but for" materiality and/or egregious misconduct during prosecution of the '883 Patent.

### THIRD CLAIM FOR RELIEF

**Georgia Uniform Deceptive Trade Practices Act**
**(O.C.G.A. § 10-1-370, *et seq*.)**

128.    Plaintiffs repeat, reallege, and incorporate the prior allegations of the Complaint as if fully set forth herein.

129.    Stoller's actions and pattern of deceptive and misleading conduct constitute unfair and deceptive trade practices in violation of O.C.G.A. § 10-1-370, *et seq*.

130.    Stoller's actions have caused, and will continue to cause, irreparable harm to Plaintiffs unless preliminary and permanently enjoined.

131.    Stoller committed the unlawful acts complained of herein willfully, knowing and intending such acts to be deceptive.

132.    Stoller knew, or should have known, that their assertions of patent infringement contained in the Threat Letters were meritless.

133.    Stoller knew, or should have known, that the '883 Patent was unenforceable due to Mr. Stoller's, Mr. Sheth's, and/or Ms. Yancy's material misrepresentations and omissions to the USPTO.

134.    Because the '883 Patent is unenforceable due to inequitable conduct before the USPTO and because Plaintiffs do not infringe any claim of the '883 Patent, the assertions of patent infringement in the Threat Letters are meritless.

135.    Stoller's false and misleading representations that Plaintiffs infringe enforceable

claims of the '883 Patent constitute deceptive trade practices in violation of O.C.G.A. § 10-1-370, *et seq*.

136.    In the course of Stoller's acts within the State of Georgia, Stoller disparaged the products and business of the Plaintiffs by knowingly making false and misleading representations that the Relevant Products infringe enforceable claims of the '883 Patent.

137.    Stoller's conduct in this case follows a course of conduct common with Stoller's action in relation to Stoller's other competitors.

138.    Recently, Stoller was found to have engaged in a decade-long campaign of falsely disparaging a competitor's product in an effort to interfere with the competitor's business. Specifically, in 2016, Stoller was ordered to pay $44.5-million as a result of substantial evidence that Stoller and its executives intentionally spread falsehoods about a competitor's products over a 10-year period that ultimately interfered with the competitor's business relationships, resulting in a substantial impact on the company and its brand. (Ex. L).

139.    Stoller is liable for Plaintiffs' damages as a result of Stoller's deceptive trade practices, in addition to costs and reasonable attorney's fees under O.C.G.A. § 10-1-373.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court to enter judgment in their favor and against Stoller as follows:

1.    For judgment that Plaintiffs and their customers do not infringe and have not infringed under 35 U.S.C. § 271 (or any sub-section thereof) any claim of the '883 Patent;

2.    For judgment that the Relevant Products do not infringe and have not infringed under 35 U.S.C. § 271 (or any sub-section thereof) any claim of the '883 Patent;

3.    For judgment that the '883 Patent is unenforceable due to Stoller's inequitable

conduct before the U.S. Patent and Trademark Office;

4.      To enjoin Stoller and its officers or employees from: (1) alleging that the Plaintiffs or their customers infringe any claim of the '883 Patent; (2) taking any action to suggest that Plaintiffs or their customers require a license from Stoller for any claim of the '883 Patent; or (3) pursuing or continuing to pursue infringement actions against Plaintiffs or their customers based on the manufacture, use, sale, or offer for sale, or importation of the Relevant Products;

5.      For costs and reasonable attorneys' fees incurred in connection with this action; and

6.      For such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable in this Complaint.

Dated: February 5, 2019

*/s/ Steven D. Moore*

Steven D. Moore (Ga Bar No. 520745)
Kilpatrick Townsend & Stockton, LLP
Two Embarcadero Center
Suite 1900
San Francisco, CA 94111
415.576.0200
SMoore@kilpatricktownsend.com

Of Counsel
John C. Alemanni (*pro hac vice pending*)
Kilpatrick Townsend & Stockton, LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
919.420.1700
JAlemanni@kilpatricktownsend.com

Michael T. Morlock (Ga. Bar No. 647460)
Admission to USDC, MDGa Pending
Kilpatrick Townsend & Stockton, LLP
1100 Peachtree St. NE, Suite 2800
Atlanta, GA 30309
404.815.6500
MMorlock@kilpatricktownsend.com

Justin L Krieger (*pro hac vice pending*)
Kilpatrick Townsend & Stockton, LLP
1400 Wewatta St., Suite 600
Denver, CO 80202
303.571.4000
JKrieger@kilpatricktownsend.com